W. F. Carpenter v. Commissioner. Ray Nichols and Edith Nichols v. Commissioner.
Carpenter v. Commissioner
Docket Nos. 42094, 42095.
United States Tax Court
T.C. Memo 1954-111; 1954 Tax Ct. Memo LEXIS 131; 13 T.C.M. (CCH) 711; T.C.M. (RIA) 54217; July 30, 1954, Filed *131 James C. Herndon, Esq., 430 Second National Building, Akron, Ohio, and Robert E. Sheck, Esq., for the petitioners. Michael J. Clare, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Respondent determined deficiencies in income taxes against the petitioners herein as follows: 1948
1949
1950
W. F. Carpenter
$1,024.80
$3,665.64
$2,519.13
Ray Nichols and
Edith Nichols
761.34
2,579.78
1,810.58 The only question is whether respondent correctly increased the distributive partnership income of each of the petitioners by increasing the net income of that partnership to 10 per cent of its gross receipts. Findings of Fact Petitioner, W. F. Carpenter, is an individual residing in East Liverpool, Ohio. He filed his individual income tax returns for the taxable years 1948, 1949, and 1950 with the collector for the eighteenth district of Ohio. Petitioners Ray Nichols and Edith Nichols are husband and wife residing in East Liverpool, Ohio. They filed joint income tax returns for the taxable years 1948, 1949, and 1950 with the collector for the eighteenth district of Ohio. During the taxable years in controversy, *132 W. F. Carpenter and Ray Nichols, hereinafter called petitioners, operated a partnership in East Liverpool, Ohio. The partnership was engaged in booking race wagers under the name "Club Billiards." It had no other source of income. Partnership returns were filed for each of the taxable years 1948, 1949, and 1950, signed by petitioner Nichols. Receipts, deductions, and net income were reported on the returns as follows: 1948
1949
1950
Receipts
$28,622.30
$28,420.16
$26,251.38
Deductions: Salaries
6,250.00
7,080.00
7,260.00
Rent
900.00
900.00
900.00
Taxes
55.01
74.18
105.79
Depreciation
7.90
25.67
43.34
Repairs
225.01
Ticket serv-
ice
5,400.00
5,616.00
5,616.00
Forms
2,163.93
3,470.19
2,815.83
Supplies
910.73
510.86
282.94
L.P. & heat
259.67
240.97
247.29
Phone
130.25
161.04
277.35
Miscellaneous
67.00
11.11
Personal
property
tax
20.33
$16,164.82
$18,315.03
$17,548.63
Net income
$12,457.48
$10,105.13
$ 8,702.75
The partnership was commenced during the year 1947. On November 1, 1951, a Federal excise tax placing a 10 per cent excise tax on the gross receipts of bookmakers became effective. Petitioners *133 determined that the partnership could not make 10 per cent on its gross receipts. Consequently, they dissolved the partnership and suspended business on November 1, 1951. Since then no bookmaking operations have been carried on. The partnership recorded the bets made with it on what was called a counter pad or counter sheets. The counter pad consisted of a printed pink ticket with a white carbon copy underneath. For certain types of bets known a "parlays" or "if come," notations were written separately on ordinary small white pads, in duplicate. A wallboard showed the horses running in the races at various tracks. Each horse listed on the wallboard was given a number. When a bet was placed with the partnership, the customer would select the horse by number. The number of the horse, the amount and position bet would be recorded in writing on the original ticket, which would be given to the customer. The carbon copy of the ticket reflected all information set forth on the original pink ticket to the customer. The amounts paid off on winning tickets were entered in the extreme right hand column of the white carbon copy of the counter sheet. At the close of business for each day, the *134 white carbon copy of the counter tickets sold would be summarized, as would be the total cash paid out to winners. The summary would indicate the total cash taken in by the partnership for the day on bets, and the total cash paid out to winners. This information would be entered daily in a daybook maintained by the partnership in the regular course of business, for accounting purposes. The daybook also contained entries of daily expenses, most of which were paid by check. Layoff bets were recorded only as pay-outs. No entries were made for the winnings on any lay-off bets, nor were any entries made to indicate that these bets were outstanding. After summarization and entry in the partnership daybook, the carbon copy of the counter sheets would be placed in a steel file and kept for a period of approximately 3 months, for reference purposes, and until the files had an overaccumulation of slips. The partnership had no available space in which to store the excess slips. Accordingly, as a protective measure against fire, the files would be emptied periodically and the white carbon copies of the counter sheets destroyed. At the close of each year's business, the partnership daybook *135 would be taken to a public accountant for preparation of the partnership tax returns and the returns of the respective individual partners. The accountant would accumulate and summarize the day-by-day totals by months on work sheets and prepare the returns from the work sheets. For the years 1948, 1949, and 1950, the summary schedules prepared by the accountant from the daybook maintained by the partnership reflected the following information: Gross
Cash Paid Out
Gross
Year
Receipts
on "Wins"
Income
1948
$209,910.60
$181,288.30
$28,622.30
1949
343,227.57
* 315,871.00
27,356.57
1950
270,761.75
244,510.37
26,251.38
The only record made available to respondent's agent in the conduct of the examination of the partnership was its daybook, a single-entry bookkeeping record which had been maintained by petitioner Nichols. The daybook indicates that the gross receipts of the partnership, or total bets received, during the years involved were as follows: 1948
$209,910.60
1949
343,227.57
1950
270,761.75
*136 The daybook also indicates that the partnership paid out as winnings the following amounts: 1948
$181,288.30
1949
314,807.41
1950
244,510.37 The difference between the bets received and winnings paid out was reported as the receipts of the partnership. None of the deductions claimed on the partnership return of the "Club Billiards" for the years 1948, 1949, and 1950 are now in issue in this proceeding. Petitioners reported on their returns income from the partnership in the following amounts for each of the years involved: Carpenter
Nichols
1948
$6,228.74
$6,228.74
1949
5,052.56
5,052.57
1950
4,351.38
4,351.37
Respondent's agent determined that adequate books and records were not kept by the petitioners, and that there was an understatement of income reported on the returns filed. The agent then attempted to determine the correct income of the petitioners by use of the net worth method. The agent could not reconstruct the net income on this basis as petitioner Nichols was unable to submit a statement as to the opening amount of cash on hand. Petitioner Carpenter stated that he had about $2,000. During the taxable years involved, *137 petitioner Nichols purchased from savings for cash a home that cost $9,200 and an automobile that cost between $3,200 and $3,300. No extraordinary expenditures were made by petitioner Carpenter. The partnership had two employees during the years in controversy who received bets, wrote tickets and made pay-offs. In the deficiency notice, respondent determined that the net income of the partnership should amount to 10 per cent of the partnership gross receipts for each of the years 1948, 1949, and 1950. Accordingly, he increased petitioners' distributable partnership income reported on their individual returns in the amounts of $4,271.50 for 1948; $12,108.93 for 1949; and $9,186.63 for 1950. This increase in petitioners' gross income resulted from respondent's determination that the net partnership income of the "Club Billiards" for the years 1948, 1949, and 1950 should be increased in the respective amounts of $8,543, $24,217.87 and $18,373.25, to bring the partnership net income up to 10 per cent of the gross partnership receipts for each of the aforementioned years. One-half of this increase was shown in the deficiency notice as being taxable to the petitioner, Ray Nichols, and *138 the remaining one-half of this increase was shown in the deficiency notice as being taxable to the remaining petitioner in the consolidated proceeding, William F. Carpenter. At no time during the operation and existence of the partnership "Club Billiards," from January 1, 1947 to November 1, 1951, did the partnership, its members or employees, make any payments or give anything of value to public officials or law-enforcement officers for the privilege of operating their business. Petitioner Ray Nichols, at the time of the hearing, was 62 years of age. He had received a a grade school education. Thereafter, he worked as an apprentice printer and as a switchboard operator in a power plant, until entering the United States Army in 1917. After his discharge, he again took up employment as a printer and later worked as a sign painter. During the depression of the early 1930's he found it difficult to find employment. About 1932, he accepted employment in East Liverpool, Ohio, with a bookmaker and retained such employment until 1947, when he acquired a partnership interest in the "Club Billiards" for $1,400. Petitioner Nichols was married about 1937. His wife, Edith, was employed at *139 the time of their marriage and for some time thereafter. No children have been born of the marriage. At the time of their marriage, petitioner Nichols and his wife had saved $6,000 or $7,000 from their earnings. Of this amount petitioner had saved approximately one-third. Petitioner has owned only one automobile in his entire lifetime, a 1949 Buick automobile which he purchased in 1949 with part of the joint savings he and his wife had accumulated over the years. He paid $3,200 or $3,300 in cash for this automobile. During the years 1948, 1949, and 1950, petitioner and his wife took modest vacation trips that cost between $200 and $300 each for both of them. Opinion Accurately stated the real issue seems to be, not the size of petitioners' gross "take" or "play" nor the amount of their property deducted business expenses, but the net "take," the excess of wagers received over amounts paid out, which for identification we refer to as net receipts. This is not, it is true, the language in which the issue is phrased by either party, but a fair reading of the record supports it. Respondent evidently (and concededly) [1] determined the deficiency by ascribing 10 per cent of the *140 gross play to net income of the partnership. No intermediate steps were apparently taken. Whether or not the method was correct, it thus assumes as a starting point that the figures for gross receipts - the gross take - were accurate. Similarly neither the revenue agent, according to his testimony, nor respondent, by stipulation at the hearing, raised any question as to the partnership's claimed deductions for business expenses. From these two amounts, what we have described as the "net receipts" of the partnership could be computed, but it is not clear that this was done by respondent at any time. What is clear is that this would not have been 10 per cent of the gross receipts in any year, nor that it would have been the same percentage of the gross receipts in any two of the three years in issue. While we need not, and do not, pass upon the propriety of percentage computations generally, see e.g., , it seems to us that in this *141 case the failure to compute any figure, still less a consistent percentage, for net receipts sustains petitioners' contention that the determination was not only arbitrary but unreasonable. . The presence of the uncontested business expense deductions in varying but comparatively large amounts in each year impresses us as rendering the method used inadmissible. This conclusion is in fact suggested by one of the very cases relied on by respondent. In , respondent's calculation of petitioner's income did not have its inception in gross receipts, but in what was supposedly gross income. "To determine petitioner's net taxable income from his betting transactions the respondent has, in the absence of any accounting records for 1930, resorted to the method of using 5 percent of petitioner's total bank deposits, after eliminating therefrom certain deposits ascertained not to represent income. Such method, in effect, allows petitioner a deduction of 95 percent of gross income as the ordinary and necessary expenses of that business." . [Italics supplied.] The distinctions *142 between that case and this are thus apparent. There, since records were unavailable, the amount of total deductions had to be determined. There, not petitioners' own records, but those of a bank had to be resorted to as a point of departure. And, even so, a 5 per cent, rather than a 10 per cent figure for the net income of a wagering business was employed. The explanation here of the derivation of the 10 per cent formula is scant and unsatisfactory. As an estimation of the net receipts, as opposed to the net income, of such a business it would be well supported by the experience indicated by petitioners' own records. Thus, the average gross receipts for the 3 years in controversy, as shown by petitioners' accounts and apparently accepted by respondent was $274,633.30, 10 per cent of which, $27,463.33 is almost identical with the $27,410.08 average net receipts likewise recorded by petitioners, before the deduction of the business expenses not challenged. As an approximation of the formula by which odds are calculated by racing gamblers generally it might well be a method of universal application which could be sanctioned as having a rational basis. But we think, as has been said, *143 that under the present circumstances, and as applied to the net income of these petitioners, it is, as characterized by respondent's witness, "arbitrary" and "not based on fact." The deficiency cannot, accordingly, be sustained. Decisions will be entered for the petitioners. Footnotes
*. The accountant's schedule for 1949 contains the following statement: "1951 Note - Error of 1063.59 included twice. To be corrected."↩
1. "I think the income was reconstructed and the reconstruction was based upon the 10 per cent of the gross receipts as disclosed by their own daybook." [Statement by respondent's counsel at the hearing.]↩